IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| KATHLEEN A.,[1] | ) | |
| | ) | |
| Plaintiff, | ) | No. 20 C 3978 |
| | ) | |
| v. | ) | Magistrate Judge Jeffrey Cole |
| | ) | |
| KILOLO KIJAKAZI, | ) | |
| Acting Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM OPINION AND ORDER**

Plaintiff applied for Disability Insurance Benefits and Supplemental Security Income under Title II of the Social Security Act ("Act"), 42 U.S.C. §§416(I), 423, over three years ago in May of 2017. (Administrative Record (R.) 217-18). She claimed that she has been disabled since March 4, 2017, due to "Lupus, Raynaud's disease, PVC, spinal stenosis and IBS." (R. 217, 246). Over the next three years, plaintiff's application was denied at every level of administrative review: initial, reconsideration, administrative law judge (ALJ), and appeals council. It is the ALJ's decision that is before the court for review. See 20 C.F.R. §§404.955; 404.981. Plaintiff filed suit under 42 U.S.C. § 405(g) on July 8, 2020. The parties consented to my jurisdiction pursuant to 28 U.S.C. § 636(c) on August 6, 2020. [Dkt. #7]. Plaintiff asks the court to reverse and remand the Commissioner's decision, while the Commissioner seeks an order affirming the decision.

---

[1] Northern District of Illinois Internal Operating Procedure 22 prohibits listing the full name of the Social Security applicant in an Opinion. Therefore, the plaintiff shall be listed using only their first name and the first initial of their last name.

I.

A.

Plaintiff was born on March 15, 1960, and so she was 57 years old at the time of the ALJ's decision. (R. 217). He has a high school education. (R. 247). Plaintiff has an excellent work record, working steadily from 1988 through 2017, with the exception of 2009. (R. 219-220). For much of the last fifteen years, she worked in the insurance industry as a claim support representative. (R. 247). This was a sedentary job, involving typing and writing: compiling reports, verifying claim information, and processing claim payments. (R. 265). She stopped working in 2017, when she was laid off. She looked for work, but had no success, then gave up. (R. 60-61).

Plaintiff testified that she became very fatigued climbing stairs. (R. 61). She could walk on flat ground better, probably 10-15 minutes before needing to rest. (R. 63). She went shopping with her husband. (R. 64). As for her hands, she was able to turn doorknobs or hold a coffee cup. (R. 63). She said she had an overwhelming urge to sleep and took naps during the day. (R. 65).

Plaintiff testified she experienced side effects from her medications when they were at higher doses, but was tolerating them now. (R. 66). She had trouble remembering "silly, little things," like where she had planned to go with her where children. (R. 67). She got migraines once to three times a week. (R. 70). On a bad day with her IBS, she would go to the bathroom four times a day. (R. 71).

On April 9, 2015, plaintiff was experiencing low back and left foot pain, and went for an initial consultation with Dr. Antonio Yuk, a neurologist. (R. 332). Physical examination showed no unfavorable findings; straight leg raising, range of motion, strength, gait, heel-toe walking, were all normal. (R. 333). An MRI revealed bulging discs impinging on the spinal canal at L4-5 and L5-S1, with degenerative changes and decrease in disc height at those levels. (R. 333). Dr. Yuk diagnosed

plaintiff with degenerative lumbar spine disease and recommended occasional use of over the counter pain relievers. (R. 333)

On September 2, 2015, plaintiff saw Dr. Paresh Rawal, complaining of chest pain and generalized weakness. The doctor noted a history of migraines and lupus. (R. 335). Physical exam was, again, normal. (R. 337).

On April 9, 2016, plaintiff's rheumatologist, Dr. Benjamin Frank, noted a high likelihood of lupus based on a series of lab tests, and other indicators. (R. 403). He began plaintiff on a dose of 300mg of hydroxychloroquinine ("HCQ"). (R. 403). July 1, 2016, plaintiff saw her treating rheumatologist, Dr. Benjamin Frank, with symptoms of muscle weakness and fatigue. (R. 352-353). Plaintiff had been having trouble tolerating HCQ and Dr. Frank reduced her dosage. (R. 352). But, by October, 2016, due to increased symptoms of significant fatigue, dosage was increased. (R. 353). Other medications and side effects were discussed. (R. 353). At the next visit, on January 20, 2017, plaintiff still had fatigue and joint pain, but was doing better on the increased dosage and thought was given to an additional increase. She also began to complain of memory difficulties. (R. 354). On March 17, 2017, plaintiff reported increased incidents of memory loss increase over the preceding couple of months. Fatigue persisted. There were headaches seemingly related to higher doses of plaquenil, and migraines about once a month. (R. 355). Physical exam – range of motion, strength, reflexes, sensation, gait – was normal. (R. 356).

On March 17, 2017, plaintiff had a neurologic consultation with Dr. Amarish Dave. (R.460). Dr. Dave noted that plaintiff was referred by Dr. Frank because of memory loss and muscle weakness, and lupus diagnosis. (R. 460). She had been experiencing episodes of confusion episodes, and forgot where she was going while she was driving. (R. 460). It was noted that her

3

muscle weakness had begun about a year earlier, and was particularly problematic in her thighs. (R. 357). The fatigue persisted despite taking Vitamin D supplements, and attempts to increase her dose of plaquenil (for lupus) resulted in headache and pressure behind her left eye. (R. 460). She also reported sporadic migraines. (R. 460). Nerve conduction studies were unremarkable, and Dr. Dave felt the etiology for plaintiff's symptoms was unclear. (R. 461, 470).

50 pages of uninterpretd lab tests June of 2016 (R. 332-388). 414-441 473-500 666-706

On April 2017, plaintiff returned to Dr. Frank, complaining of muscle weakness, fatigue, and memory issues. (R. 359). After receiving four B12 shots, she stated she felt more energized but still had weakness. (R. 359). At that time, Dr. Frank questioned whether plaintiff's complaints of muscle weakness might be fatigue she "perceived" as loss of strength. (R.463). Muscle weakness and fatigue continued into May 2017, but objective tests remained unremarkable. Plaintiff was advised to follow up with her primary care physician and get a full physical to look for other etiologies. (R. 361).

In November 2017, plaintiff had a consultative internal medicine examination with Dr. Roopa Karri in connection with her application for benefits. (R. 443-446). She reported that she felt constant fatigue and weakness. (R. 444). She said diet was helping with her IBS, but still complained of diarrhea up to three times per day. (R. 44). She had back and neck pain, but Aleve helped with that. (R. 444). She said she could drive and do all her daily chores. (R. 444). Examination revealed mildly reduced grip strength bilaterally, and reduced range of motion in the lumbar spine. (R. 445). Gait was normal and there was no tenderness in the joints. (R. 445). Dr. Karri's impression was lupus with Raynaud's and arthralgias, spinal stenosis with mildly decreased range of motion, irritable bowel syndrome, a history of premature ventricular contractions (PVC's), and mildly elevated blood

4

pressure. (R. 446).

In December 2017, plaintiff saw gastroenterologist Dr. Joseph Losurdo, complaining of diarrhea three times per day. (R. 562). The doctor diagnoses IBS, noted that there were certain trigger foods, and recommended a high fiber diet and a fiber supplement. (R. 564). On January 30, 2018, plaintiff returned to Dr. Frank with muscle weakness, particularly with repetitive motion. (R. 576). Noting her ongoing problem of muscle fatigue and burning with repetitive tasks, Dr. Frank diagnosed unspecified lupus and recommended plaintiff seek a second opinion at the Mayo Clinic, or Rush, or Northwestern, etc. (R. 576).

On July 10, 2018, plaintiff met with Dr. Jeremy Cutsforth-Gregory at the Mayo Clinic. (R. 721). A CT of the lumbar spine at that time revealed spondylotic changes at the L5/S1 level, with moderate to advanced foraminal narrowing, worse on the left, as well as a disc extrusion affecting the S1 nerve root. (R. 707). Dr. Cutsforth-Gregory noted that plaintiff had muscle discomfort and memory impairment in the setting of lupus treated with HCQ. (R. 721). He suspected possible neuromuscular junction defect, to be tested with EMG. He indicated that, because of her cognitive impairment, he would obtain an updated MRI of the head, and he recommended formal neuropsychometric testing, which was not available there in a timely fashion. (R. 721). Dr. Krause, a neurologist at Mayo, had administered a Kokmen STMS (short test of mental status), on which plaintiff scored 33/38, losing points on attention, construction, information, and recall. (R. 721). Dr. Cutsforth-Gregory diagnosed plaintiff with muscle fatigue, cognitive impairment, and systemic lupus erythematosus. (R. 722). He indicated that plaintiff would pursue formal memory testing locally. (R. 721).

Dr. Krause, the neurologist, thought the weakness and memory difficulties could be attributable to a vitamin B12 deficiency, but recommended that she undergo formal neuropsychiatric testing for memory difficulties once she returns home. (R. 915). Dr. Krause found Plaintiff's memory impairment to be concerning given her relatively young age. (R. 976). An EMG, blood work, and MRI of her head had come back negative for ischemia or other illnesses, but muscle weakness remained unexplained. (R. 910, 964).

Dr. Kevin Moder, another rheumatologist at Mayo, indicated that he did not believe Plaintiff's lupus was causing her weakness. (R. 910). He suggested that the weakness might be attributable to her back problems, though he recommended caution in proceeding with surgery unless a spine specialist determined that was definitely the cause. (R. 910).

On August 2018, Dr. Moder filled out a form from plaintiff's counsel; or more accurately, declined to fill out a form. (R. 627-628). Dr. Moder reported a diagnosis of systemic lupus erythematosus and said he had seem her only once and had no way to measure any functional limitations she might have. (R. 626-27). On August 7, 2018, an MRI of plaintiff's cervical spine revealed disc herniation and mild, broad-based central disc bulging with stenosis but no significant spinal cord or nerve impingement. (R. 554-55). Dr. Brian Braaksma completed a workup of plaintiff's spine and reported tenderness in the cervical spine but pain-free range of motion. Sensation was intact and reflexes normal. Testing such as Tinel's, Spurling's, etc., was all normal. (R. 531). The doctor said plaintiff's condition had improved with physical therapy and that he believed plaintiff's "perceived weakness" had nothing to do with her cervical and lumbar spine. (R. 532).

Plaintiff reported some relief from activity modification, rest, and anti-inflammatory medication. (R.538). In September 2018, plaintiff reported she was responding well the physical therapy. (R. 518). In October 2018, an MRI of plaintiff's right knee revealed internal derangement of her right knee joint, and cortisone injections were recommended and administered. (R. 512-513). In July 2019, plaintiff reported that she was apprehensive about surgical intervention, and further physical therapy was recommended for her neck and shoulders. (R. 1088).

**B.**

After two administrative hearings at which plaintiff, represented by counsel, testified, along with a different vocational expert each time, the ALJ determined the plaintiff had the following severe impairments: lupus, spine disorder, joint dysfunction. (R. 17). The ALJ dismissed plaintiff's irritable bowel syndrome as a non-severe impairment treated with conservative measures. (R. 17). The ALJ then found that plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of one of the impairments listed in the Listing of Impairments, 20 C.F.R. Part 404, Subpart P, Appendix 1, specifically considering Listing 1.04, covering plaintiff's back impairment, Listing 5.06, covering plaintiff's IBS, and Listing 14.02, covering plaintiff's lupus. (R. 18).

The ALJ then determined that plaintiff had the capacity to lift and/or carry up to twenty pounds occasionally and ten pounds frequently. She had no limitations on her capacity to sit throughout the day. She had no limitation on the total time she could sit or stand in a day, but she had to sit for five minutes after standing or walking for an hour without being off task. She had to work in non-hazardous environments, i.e., no driving at work, operating moving machinery, working at unprotected heights or around exposed flames and unguarded large bodies of water, and she

7

should had to avoid concentrated exposure to unguarded hazardous machinery. (R. 18-19). The ALJ then found that the plaintiff's "medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, [her] statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record for the reasons explained in this decision." (R. 20). The ALJ said the plaintiff's allegations about drug side effects were not supported by the record. She never had her memory formally tested. Even with some memory limitations, plaintiff could still perform her past work, the ALJ further explained. (R. 20). The ALJ then summarized the medical record. (R. 20-23). He noted that plaintiff was able to clean, do laundry, drive, shop in stores and by computer, handle money, weed, cook small meals, and go out to eat. (R. 23). The ALJ accommodated plaintiff's allegations of stiffness with the requirement of alternating positions for five minutes each hour. (R. 23).

The ALJ found the opinions of the state agency reviewing doctors somewhat supportable, consistent, and persuasive; he rejected the postural limitations and opinion that the claimant is able to sit, stand, or walk for about six hours in a workday. (R. 24). The ALJ accepted the opinion of the psychological consultant that the plaintiff had no medically determinable mental impairment. (R. 24). The ALJ rejected an opinion from a physician who had seen plaintiff just once, and found another from treating doctor unpersuasive and inconsistent with the psychological consultant's opinion. (R. 25).

Next, the ALJ determined that the plaintiff could perform her past work as a customer service clerk- insurance (DOT number 249.262-010, SVP 6, sedentary per the DOT, sedentary as actually performed), receptionist (DOT number 237.367-038, SVP 4, sedentary per the DOT, sedentary as

8

actually performed), and secretary (DOT number 201.362-010, SVP 6, sedentary per the DOT, sedentary as actually performed). In so finding, the ALJ explained that both vocational experts had testified that the plaintiff would be able to perform her past work as a customer service clerk-insurance, receptionist, and secretary. (R. 26). Accordingly, the ALJ found plaintiff not disabled and not entitled to benefits under the Act. (R. 26-27).

## II.

If the ALJ's decision is supported by "substantial evidence", the court on judicial review must uphold that decision even if the court might have decided the case differently in the first instance. *See* 42 U.S.C. § 405(g). "Substantial evidence" is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales,* 402 U.S. 389, 401 (1971). *See also, Beardsley v. Colvin*, 758 F.3d 834, 836 (7th Cir. 2014). To determine whether "substantial evidence" exists, the court reviews the record as a whole, *Biestek v. Berryhill*, – U.S. –, –, 139 S. Ct. 1148, 1154 (2019), but does not attempt to substitute its judgment for the ALJ's by reweighing the evidence, resolving material conflicts, or reconsidering facts or the credibility of witnesses. *Wright v. Kijakazi*, _Fed.Appx._, 2021 WL 3832347 at *5 (7th Cir. 2021); *Beardsley*, 758 F.3d at 837. "Where conflicting evidence allows reasonable minds to differ as to whether a claimant is entitled to benefits," the court must defer to the Commissioner's resolution of that conflict. *Binion v. Chater,* 108 F.3d 780, 782 (7th Cir.1997); *Schloesser v. Berryhill*, 870 F.3d 712, 717 (7th Cir. 2017).

While the threshold for evidentiary sufficiency under the "substantial evidence" standard is not high, *Biestek*, 139 S. Ct. at 1154; *Wright v. Kijakazi*, *supra*, in the Seventh Circuit, the ALJ has long had an obligation to build what the court has called an "accurate and logical bridge" between

9

the evidence and the result so as (theoretically) to afford the claimant meaningful judicial review of the administrative findings. *Varga v. Colvin*, 794 F.3d 809, 813 (7th Cir. 2015); *O'Connor–Spinner v. Astrue,* 627 F.3d 614, 618 (7th Cir. 2010). Under the doctrine, even if the court agrees with the ultimate result, the case must be remanded if the ALJ fails in his or her obligation to build a "logical bridge." In *Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir. 1996), the case which first used the term in the Seventh Circuit in an administrative law context, the court said "we cannot uphold a decision by an administrative agency, any more than we can uphold a decision by a district court, if, while there is enough evidence in the record to support the decision, the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result." The court has to be able to trace the path of the ALJ's reasoning from evidence to conclusion. *Minnick v. Colvin*, 775 F.3d 929, 938 (7th Cir. 2015); *Jelinek v. Astrue*, 662 F.3d 805, 812 (7th Cir. 2011). But *see, e.g.*, *Riley v. City of Kokomo*, 909 F.3d 182, 188 (7th Cir. 2018)("But we need not address either of those issues here because, even if [plaintiff] were correct on both counts, we may affirm on any basis appearing in the record, ...."); *Steimel v. Wernert*, 823 F.3d 902, 917 (7th Cir. 2016)("We have serious reservations about this decision, which strikes us as too sweeping. Nonetheless, we may affirm on any basis that fairly appears in the record."); *Kidwell v. Eisenhauer*, 679 F.3d 957, 965 (7th Cir. 2012)("[District court] did not properly allocate the burden of proof on the causation element between the parties, ... No matter, because we may affirm on any basis that appears in the record.").[2]

---

[2] The phrase "logical bridge," seems to have first appeared in *Thompson v. Clifford*, 408 F.2d 154, 167 (D.C. Cir. 1968), where Judge Spottswood Robinson said in an administrative case not involving Social Security that: " 'Administrative determinations must have a basis in law' and their force depends heavily on the validity of the reasoning in the logical bridge between statute and regulation." Judge Posner then used the phrase "logical bridge" in a Social Security case merely to require Administrative Law Judges to articulate the reasons for their decisions. *Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir. 1996)*.* But, *Sarchet*
(continued...)

Of course, the Seventh Circuit's logical bridge requirement is subjective: one reader's Mackinac Bridge is another's rickety rope and rotting wood nightmare. The subjectivity of the requirement makes it difficult for ALJs to write decisions that stand up to judicial scrutiny when challenged, or when upheld at the district court level and challenged again before the Seventh Circuit. Still, at the same time, the Seventh Circuit has also called this requirement "lax." *Elder v. Astrue*, 529 F.3d 408, 415 (7th Cir. 2008); *Berger v. Astrue*, 516 F.3d 539, 545 (7th Cir. 2008). "If a sketchy opinion assures us that the ALJ considered the important evidence, and the opinion enables us to trace the path of the ALJ's reasoning, the ALJ has done enough." *Stephens v. Heckler*, 766 F.2d 284, 287-88 (7th Cir. 1985).

In sum, the "logical bridge" requirement, even in its strictest form, is not about *elegantia juris or* aesthetics. The ALJ need not build the Pont Neuf so long as the "bridge" allows the reviewing court to traverse the divide between the evidence and the conclusions. *Mogg v. Barnhart*, 199 F. App'x 572, 576 (7th Cir. 2006); *Brindisi ex rel. Brindisi v. Barnhart*, 315 F.3d 783, 787 (7th Cir. 2003). This, is at least how things stood until the Order by Judges Sykes, Easterbrook and Scudder in *Brumaugh v. Saul*, 850 F. App'x 973, 977 (7th Cir. 2021) – which seem to cast doubt on the "logical bridge" requirement – at least as many had understood it. There, the plaintiff argued that the ALJ failed to build a "logical bridge" from the evidence to his determination that the plaintiff was capable of light work. The plaintiff contended that the ALJ should have *explained* what changed

---

[2](...continued)
did not heighten the burden of proof or inform ALJs in Social Security cases of rules that had to be followed or tests to be employed. *Sarchet* never intended that the "logical bridge" requirement compel or warrant a hypercritical approach to an ALJ's decision. Not surprisingly, the Seventh Circuit has described the "logical bridge" requirement, even as strictly understood, as "lax." *Elder v. Astrue*, 529 F.3d 408, 415 (7th Cir. 2008); *Berger v. Astrue*, 516 F.3d 539, 545 (7th Cir.2008).

11

after the first ALJ's conclusion that she could only do sedentary work, and since she did not, the "logical bridge" requirement had not been satisfied – and reversal was therefore mandatory. The Court of Appeals, citing *Biestek's*, 139 S.Ct. 1152 substantial evidence requirement, unhesitatingly rejected this contention, saying: "[t]his argument rests on a *faulty premise*: the 'logical bridge' language in our caselaw *is descriptive but does not alter the applicable substantial-evidence standard*." 850 F.App'x at 977 (Emphasis supplied). Since the ALJ's decision was supported by substantial evidence, the Court of Appeals affirmed.³

The ALJ's explanations in this case more than satisfy the obligations imposed on the ALJ whether under a rigid version of the "logical bridge" requirement or under *Brumbaugh's* apparent rendition of the requirement and its apparent rejection of the notion that perhaps more than "substantial evidence" may be required to warrant an affirmance of an ALJ's decision in a Social Security case.

No matter how the evidence is viewed in this case, or what "standard" is to be applied, the ALJ has done more than enough here to warrant affirmance.

**III.**

In reviewing the ALJ's decision, we have to give it a "common-sense reading. *Fanta v. Saul*, 2021 WL 961647, at *3 (7th Cir. 2021); *Jones v. Astrue*, 623 F.3d 1155, 1160 (7th Cir. 2010); *Castile v. Astrue*, 617 F.3d 923, 929 (7th Cir. 2010). In that regard, it is important not to put out of view that the ALJ found the plaintiff not disabled *at step four*. He found that she retained the

---

³ Five months after *Brumbaugh*, the court in *Wright v. Kijakazi*, _Fed.Appx._, 2021 WL 3832347 cited the "logical bridge" language with seeming and unqualified approval. But it should not be overlooked that the precise question about the meaning, applicability, and extent of the logical bridge doctrine was not before the court in *Wright* – or for that matter in *Brumbaugh*.

residual functional capacity to perform her past relevant work. It was the plaintiff's burden of proof to show she could not, *Gedatus v. Saul*, 994 F.3d 893, 898 (7th Cir. 2021); *Moore v. Colvin*, 743 F.3d 1118, 1121 (7th Cir. 2014) and she didn't. And, it has to be said, she has failed to do so here as well.

A plaintiff is not disabled if she can do her past relevant work either in the manner she performed it or in the manner it is generally performed in the national economy. *Ray v. Berryhill*, 915 F.3d 486, 491 (7th Cir. 2019); *Getch v. Astrue*, 539 F.3d 473, 482 (7th Cir. 2008). As plaintiff described her most recent job, claims support representative, she had to stand for no more than a half hour a day. She sat the rest of the time and did absolutely no lifting, with the exception of picking up a telephone. (R. 265). Her receptionist job was also a sit-down job. It involved a bit more standing and walking – about an hour a day – but, again, no lifting other than answering the telephone. (R. 266). Her other past work was essentially the same: little or no standing or walking and little or no lifting. (R. 267-269). The vocational expert also testified that these jobs were sedentary, both as they are generally performed in the national economy and as plaintiff actually performed them. (R. 40).

That being the case, one has to question why the plaintiff directs the bulk of her argument for overturning the ALJ's decision at the ALJ's finding that she can walk or stand. The plaintiff begins by arguing that the ALJ's finding that she can perform light work with a handful of postural limitations is unsupported by "substantial evidence." [Dkt. #19, at 9]. She goes on to assert that "[t]he most obvious and inexplicable error in the RFC assessment is the ALJ's determination that Plaintiff has no limitations on her ability to walk, stand, or sit in an eight-hour workday." [Dkt. #19,

at 9]. She continues by arguing that "[t]here is not a single functional assessment in the record that supports a finding that Plaintiff can walk or stand for eight hours a day (even with a five minute break every hour). Even the non-examining state agency consultants, whose opinions the ALJ found "somewhat supportable," limited her to no more than six hours per day of standing or walking." [Dkt. #19, at 9-10].

Plaintiff adds that "[t]hough her gait, when she is walking, may not be antalgic, the medical records support a finding that she is unable to sustain ambulation for any great length of time. The medical record certainly does not support a finding that she has the muscle strength or endurance to walk or stand for a full eight hours in an eight hour workday, contrary to the ALJ's finding. Moreover, the ALJ's accommodation for shifting positions for five minutes every hour is not only unsupported but also makes no sense." [Dkt. #19, at 10]. Plaintiff concludes by reiterating that she feels "[t]here is no support in the record for the ALJ's finding that Plaintiff can sustain the amount of walking and standing provided for in the ALJ's RFC assessment, with no postural exceptions and only a minimal accommodation for shifting positions, five days a week, eight hours a day. [Dkt. #19, at 12]. Perhaps all that is true; but, as Judge Easterbrook said in another context: "So What? ... Who cares?" *Israel Travel Advis. Serv. v. Israel Iden. Tours*, 61 F.3d 1250, 1259 (7th Cir. 1995). It wasn't the ALJ's burden to prove plaintiff could perform a job that required her to walk eight hours every day; it was – and is – plaintiff's burden to prove she couldn't perform her past *sedentary* work. That was work, which as she described it, involved *no* walking and standing to *very little* walking and standing. That means she doesn't have "to sustain ambulation for any great length of time." Nor does she have to "walk or stand for eight hours a day (even with a five minute break every hour)." As for whether the ALJ's accommodation made sense, again, it doesn't matter. As

14

the VE explained to counsel at the administrative hearing, plaintiff's past work was sedentary, so there "really wouldn't be a regular situation standing for 60 minutes . . . If there was a situation in these sedentary jobs where they had to stand for 60 minutes, I think they could sit for 5. However, my understanding is these people would primarily sit all day long." (R. 46).

Missing from the plaintiff's brief is citation to medical evidence showing, not that she can't walk all day, but that she can't even sit all day. *See Castile v. Astrue*, 617 F.3d 923, 927 (7th Cir. 2010); *Eichstadt v. Astrue*, 534 F.3d 663, 668 (7th Cir. 2008)("the claimant bears the risk of uncertainty, ...."); *Scheck v. Barnhart*, 357 F.3d 697, 702 (7th Cir. 2004)("It is axiomatic that the claimant bears the burden of supplying adequate records and evidence to prove their claim of disability."). None of the medical evidence plaintiff does direct the court to proves she is unable to do a job where she can sit all day. Moreover, none of her doctors said she couldn't. Without any citation to evidence that proves plaintiff can't perform sedentary work, plaintiff's brief simply does not support her claim that the ALJ's decision must be overturned. *See Diaz v. Chater*, 55 F.3d 300, 307 (7th Cir.1995) (ALJ erred in finding that applicant could do light work, but not in finding that applicant could do sedentary work); *Anderson v. Bowen*, 868 F.2d 921, 926 (7th Cir.1989) (same); *Cf. Johnson v. Bowen*, 851 F.2d 748, 751 (5th Cir.1988) (upholding district court's decision that, even though SSA's determination that claimant could perform light work was not supported by "substantial evidence", SSA's ruling could be affirmed because "there was "substantial evidence" in the record to support a conclusion that [the claimant] could perform sedentary work").

Plaintiff next argues that the ALJ essentially ignored her mental impairment – meaning her memory issues – "by noting that there is no finding of an actual mental impairment. R. 20." [Dkt.

15

#19, at 12]. That's not exactly right. Plaintiff does not allege a mental impairment in the sense that these disability cases talk about, like depression, anxiety, or other psychological maladies. She did testify to memory loss regarding "silly little things"like forgetting a date with her children or a co-worker' name, and also getting lost driving on one occasion. But the ALJ did not ignore those claims, nor did he ignore her complaints about them to her physicians; on the contrary, he discussed and assessed them. (R. 20). He noted that the consultative examiner found that the claimant was alert and oriented, and had normal memory, appearance, behavior, and ability to relate. He noted that plaintiff's memory issues didn't give her trouble at her job, as she was laid off due to restructuring, not fired due to diminishing performance. (R. 20). *See Lazier v. Colvin*, 601 F. App'x 442, 445 (7th Cir. 2015)(ALJ properly considered fact that plaintiff was able to work despite bipolar disorder); *see also Johnson v. Berryhill*, 745 F. App'x 247, 251 (7th Cir. 2018); *Summers v. Berryhill*, 864 F.3d 523, 528 (7th Cir. 2017). He noted that, despite her alleged memory issues, she continued to drive. Plaintiff seems to belittle this observation, likening her driving despite memory issues to an athlete "play[ing] through pain." [Dkt. #19, at 14]. That is an invalid comparison. In any event, it does not mean that the ALJ's observation that perhaps plaintiff's claimed memory problems are not so limiting as she claims – is invalid.

Plaintiff asserts that in the Kokmen test given at the Mayo Clinic, she scored low in attention, construction, information, and recall. [Dkt. #19, at 13]. That's not exactly accurate. The record does not say she "scored low", but that she "lost points" in those areas – there are eight areas tested, including orientation, immediate recall, calculation, and abstraction, (https://www.ouhsc.edu/age/Brief_Cog_Screen/documents/STMS.pdf) – but scored 33/38 overall.

16

(R. 721). There was no interpretation of a score of 33 in terms of degree of impairment[4], only an indication from Dr. Cutsforth-Gregory that plaintiff would be following up with formal testing locally. (R. 721-22). She never did.[5]

"Substantial evidence" review means that if reasonable minds could differ as to the weight of evidence or testimony, the court cannot substitute its judgment for that of the ALJ. *Karr v. Saul*, 989 F.3d 508, 513 (7th Cir. 2021); *Zoch v. Saul*, 981 F.3d 597, 602 (7th Cir. 2020). It may be that the plaintiff has a different interpretation of the evidence relating to a memory issue than the ALJ did, but that's not dispositive. As long as the ALJ's interpretation was acceptable from a logic standpoint – what "a reasonable mind might accept as adequate to support a conclusion," *Biestek*, – U.S. at –, 139 S. Ct. at 1154; *Gedatus,* 994 F.3d at 900 – and it was, the court cannot substitute another interpretation.

The same can be said for plaintiff's alleged limitations due to IBS, migraines, or with handling items. Plaintiff cites just one medical evaluation of her IBS, from Dr. Losurdo in December 2017. [Dkt. #19, at 14]. The doctor noted that she had to take a bathroom break three times during her waking hours, but never through the night. It could be controlled with diet: avoiding certain foods and high-fiber intake. There were no additional symptoms that might be cause for concern, such as weight loss, pain, melena, or hemotechezia. Dr. Losurdo recommended

---

[4] The court is not qualified to interpret the test results, but as nothing more than an indication that, again, reasonable minds can differ, there are a number of indications that a score of 33 is in the "normal" range. *Warren v. Colvin*, 2015 WL 3917111, at *5 (D.S.C. 2015)(32 of 38 points on the Kokmen Short Test of Mental Status, which was considered normal); http://www.actonalz.org/sites/default/files/documents/ACT-ProviderChecklist.pdf (below 29-30 as cutoff for further workup); https://static1.squarespace.com/ static/559c4229e4b0482682e8df9b/t/57714b5c725 e25e3094ee745/1467042653378/DFA-Tools-ProviderChecklist.pdf(same).

[5] Plaintiff claims in her brief that her insurance did not cover "formal neuropsychometric testing." (R. 58, 721).

conservative treatment and noted no restrictions on activity other than dietary restrictions. (R. 562-64). That is not a condition that necessarily precludes plaintiff's past work.

Plaintiff alleged she got migraines once to three times a week. (R. 70). But the medical record indicated they were "sporadic", occurring once a month. (R. 355, 460). They appear to have warranted a mention from plaintiff or her doctors just once, back in March of 2017. Plaintiff did not indicate they were a problem at her consultative exam. (R. 443, 446). As for plaintiff's ability to use her hands, as plaintiff concedes, upon examinations, her grip strength was only minimally reduced. (R. 445). Again, with this as the only evidence the plaintiff presents to establish her IBS or grip as precluding her ability to perform her past sedentary work, the ALJ's determination that it would not preclude such work was well within the realm of rationality. *See, e.g., Gedatus v. Saul*, 994 F.3d 893, 905 (7th Cir. 2021)(plaintiff "has not pointed to any medical opinion or evidence to show any . . . specific limitations."); *Sosh v. Saul,* 818 F. App'x 542, 546 (7th Cir. 2020)("A claimant who does not 'identify medical evidence that would justify further restrictions' is not entitled to remand."); *Jozefyk v. Berryhill*, 923 F.3d 492, 498 (7th Cir. 2019) ("[E]ven if the ALJ's RFC assessment were flawed, any error was harmless" because "[i]t is unclear what kinds of work restrictions might address [claimant's] limitations ... because he hypothesizes none" and "the medical record does not support any."); *Loveless v. Colvin*, 810 F.3d 502, 508 (7th Cir. 2016)(plaintiff failed to "identify medical evidence that would justify further restrictions.").

## CONCLUSION

For the foregoing reasons, the defendant's motion for summary judgment [Dkt. #26] is granted, and the plaintiff's motion for summary judgment [Dkt. #19] is denied.

ENTERED: _____
UNITED STATES MAGISTRATE JUDGE

**DATE:** 9/27/21